UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID C. MOWRY, *et al.*, | ) | CASE NO.: 5:19-cv-00627 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | **BENCH TRIAL OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |
| | ) | |

This matter came before the Court for a bench trial on January 10 and January 11, 2023 to determine causation and damages only. Based on a review of the trial testimony, exhibits, and the record in this matter, the Court hereby enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

**I.   FINDINGS OF FACT**

    A.  Procedural Facts

On March 21, 2019, Plaintiffs David and Beverly Mowry filed a lawsuit against the United States of America ("USA") pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq*. and 28 U.S.C. § 1346, for negligence while operating a motor vehicle in violation of R.C. § 4511.43(A). On May 10, 2021, the Court found that there was no genuine issue of material fact regarding duty and breach as the Parties factually agreed that both elements were satisfied. On May 13, 2021, the Parties filed a Joint Stipulation to Facts. The bench trial for this case was scheduled for January 10, 2023 and continued through January 11, 2023. After trial, the Parties submitted proposed findings of fact and conclusions of law.

1

At trial, the USA objected to the admission of Plaintiffs' Exhibits 27 through 41 based on lack of authentication. These were photos taken of Mr. Mowry's leg at various stages in the healing process. After a review of the record, those objections are OVERRULED and the exhibits are admitted. There is sufficient evidence in the record to corroborate when those photos were taken. Further, the Court viewed Mr. Mowry's leg during trial and confirmed the photos were of Mr. Mowry. In addition, the Plaintiffs objected to the admission of the USA's Exhibit U, Dr. Melissa Bickett's discovery deposition. That objection is also OVERRULED. Dr. Bickett's deposition transcript was already made part of the record with previous briefing.

B. <u>Substantive Facts</u>

On July 16, 2017, Plaintiff David Mowry's ("Mr. Mowry") life changed forever. 69-year-old Mr. Mowry was driving his motorcycle through an intersection in Lexington Township, Ohio when he was hit by a United States Postal Service ("USPS") delivery truck. The truck hit Mr. Mowry's left side, pushing him and the motorcycle down the road while Mr. Mowry hung on to the grill on the front of the truck. The truck then ran over Mr. Mowry's left lower leg before stopping. The USPS driver was at fault for the accident.

Mr. Mowry was then transported to a local hospital where it was determined that he had open segmental comminuted fractures of the tibia and fibula in his left leg. There was bone protruding from the skin and his lower leg was contorted 180 degrees. Soon after arriving, Mr. Mowry underwent surgery with Dr. Melissa Bickett, the orthopedic surgeon on call for traumas. Dr. Bickett inserted a plate and screws on Mr. Mowry's outer fibula and inserted a rod and screws down through the tibia.

On July 19, 2017, Mr. Mowry was transferred to a rehabilitation center. Mr. Mowry went home on or about August 16, 2017. At this point, he could put 25% of his weight on his injured

leg. Once at home, Mrs. Mowry had to become his caregiver. She gave Mr. Mowry his required medications, changed his dressings, and assisted him with getting out of bed and around the house. During this time, in addition to the injury to the bone, a large section of skin on the front of Mr. Mowry's lower left leg suffered from necrosis. His skin had died because of the traumatic wound from the accident. As a result, Mr. Mowry had eschars – black scabs of dead skin – on his leg.

On September 11, 2017, Mr. Mowry saw Dr. Bickett because he was experiencing an increase in pain in his lower left leg and there was redness, swelling, and pus around the eschars. Dr. Bickett identified these as signs of an infection and instructed Mr. Mowry to change his wound dressings more frequently and to see her again in three to four weeks. At Mr. Mowry's next visit, his pain and the drainage from the wound had increased. Dr. Bickett was able to lift the eschar on Mr. Mowry's leg and see his bone protruding. Dr. Bickett determined that surgery was required to treat the infection.

On October 3, 2017, Mr. Mowry underwent surgery in which Dr. Bickett intended to conduct an irrigation and debridement where she would wash out the area to remove the infection. However, during the procedure, Dr. Bickett determined that she was not able to salvage the hardware that she had previously inserted into Mr. Mowry's leg and a more extensive surgery was needed.

On October 7, 2017, Mr. Mowry underwent another surgery in which Dr. Bickett removed the plate, rod, and screws from Mr. Mowry's leg. Dr. Bickett then inserted an antibiotic nail into the bone to treat the infection. Mr. Mowry was also given IV antibiotics to treat the infection, including Vancomycin. Further, during this surgery, Dr. Bickett discovered that two centimeters of Mr. Mowry's tibia had died, which, if not removed, would not allow for the infection to be

eradicated. As a result, this part of the tibia was removed, leaving a gap in Mr. Mowry's bone. Mr. Mowry was prohibited from walking while the antibiotic nail was in place.

On October 12, 2017, Mr. Mowry underwent surgery with a plastic surgeon. Mr. Mowry did not have sufficient muscle and skin on his leg to cover the bone. As a result, the plastic surgeon had to treat him with a "flap". The surgeon took part of Mr. Mowry's calf muscle in his left leg and rotated it around to cover the bone on the front. Then, the surgeon took skin from his thigh and placed it on top of the muscle.

On December 14, 2017, Mr. Mowry underwent another surgery with Dr. Bickett in which the antibiotic nail was removed, and a new permanent rod was inserted into the tibia. Further, a bone graft was taken from Mr. Mowry's femur to fill in the gap in the tibia where the dead bone had been removed. Multiple times between the accident and Mr. Mowry's final surgery, Dr. Bickett advised him that amputating his leg was an option. Mr. Mowry asked each time that she do whatever she could to save his leg.

On June 6, 2018, Mr. Mowry was discharged from Dr. Bickett's care. At that time, the bone had healed and there were no signs of infection. Dr. Bickett did not place any restrictions on Mr. Mowry and did not preclude him from engaging in any activity. However, Dr. Bickett testified that his leg would never be the same. She testified that his left leg would never have the same strength as it did before the accident or the same as his right leg. Mr. Mowry was advised he could do as much as he could tolerate.

Dr. Bickett testified that Mr. Mowry has "essentially a biological prosthetic" because, while he has the leg he was born with, it will never be the same due to the multiple surgeries. Further, Dr. Bickett testified that Mr. Mowry's tibia healed with a varus deformity, causing it to bow inward. Dr. Laurence Bilfield, the USA's expert witness, also stated in his Independent

4

Medical Evaluation Report, which was admitted as the USA's Exhibit E, that Mr. Mowry's "left lower extremity was mildly more varus than the right."

Dr. Bickett testified that Mr. Mowry "has a permanent and substantial physical deformity as a result of the injuries sustained in the accident." She further testified that "[t]he substantial physical deformity is mainly a result because of his musculature and joint not being able to recover from the accident and resultant surgeries." Dr. Bilfield also testified that Mr. Mowry "has a permanent deformity."

Prior to the accident, Mr. Mowry suffered from Type II diabetes, hypertension, enlarged prostate, erectile dysfunction, sleep apnea, renal cysts, bladder stones, degenerative disc disease in his lumbar spine, and chondromalacia of the patella femoral joint. He also underwent two knee arthroscopies, shoulder surgery, carpal tunnel surgery, and cervical spine surgery.

Since the accident, in 2019, Mr. Mowry was diagnosed with acute renal failure. As of March 2022, his condition has deteriorated to the point that requires he be on dialysis 12 hours each day. Prior to the accident, Mr. Mowry did not have any kidney problems or signs of renal failure. Based on her education, training, and experience as an orthopedic surgeon, Dr. Bickett testified that "[Mr. Mowry] having effects from high doses of antibiotics, him having multiple surgeries, I do think affected his medical condition and those subsequent treatments." Dr. Bickett testified that, while she is not an expert regarding kidneys, as a treating physician "every day my treatment affects the kidneys. I have to be aware of vancomycin dosing". Dr. Bickett further testified that "[y]ou can put a patient into renal failure with high doses of vancomycin".[1] When asked whether Vancomycin was a strong antibiotic, the USA's witness, Dr. Bilfield, testified that

---

[1] Dr. Bickett's testimony was given prior to trial without the Court's presence. The USA objected to the question that prompted this answer from Dr. Bickett. The objection is OVERRULED as Dr. Bickett's opinion was well within her expertise based on her education, training, and experience as an orthopedic surgeon.

5

it was. When asked whether Vancomycin can cause renal failure, Dr. Bilfield testified that, based on his education from medical school and his experience as a physician, "I'm not an expert, but I know peripherally that it can cause problems with the kidneys."

At the time of the accident, Mr. Mowry was not experiencing pain in his lower left leg. Before the accident, he was an avid shooter and particularly enjoyed trapshooting. This was not just a hobby for Mr. Mowry but a passion that he shared and enjoyed with his wife and children. They would shoot together, on average, three days a week before the accident. They also traveled to participate in shooting competitions. For almost ten years, the Mowrys helped at a gun club in Orangeburg, South Carolina during the winter. They would unload pallets of clay pigeons, each box of which weighed 35 pounds, off semi-trucks either by tractor or by hand. The club had elevated stands, up to 30 and 60 feet tall, that would throw the clay pigeons. The Mowrys would climb ladders up to the top to replenish the clay pigeons. They would help with the construction and maintenance of the buildings, repairing trap machines, and general groundskeeping. They enjoyed this work as they were able to spend their free time shooting.

Mr. Mowry also enjoyed fishing and hunting small game. He enjoyed working on cars at his home. He would build drag race cars, and he repaired vehicles for others. The Mowrys' son testified that "[m]y father's probably the best mechanic I've ever met in my entire life." Before the accident, Mr. Mowry also enjoyed riding his motorcycle whenever he could. He would ride alone or with his wife or son. Mr. Mowry would engage with other riders in the area by playing a "tag game" which involved taking a picture with his bike and posting clues as to where he was at. Mr. Mowry was enjoying this game on the day of the accident.

Mr. and Mrs. Mowry's house sits on three acres of land. Mr. Mowry would share in the yardwork and overall maintenance of the home and property. The Mowrys also owned a duplex,

6

and, like their home, Mr. Mowry would share in the overall maintenance of the property. When asked about his father's abilities prior to the accident, the Mowrys' son testified that "[t]here was nothing my father couldn't do." Their daughter described him as "Mr. Fix It."

Since the accident, Mr. Mowry experiences daily and consistent pain in his lower left leg. He describes the worst of the pain occurring approximately six inches below his kneecap, where the largest eschar and the dead portion of tibia bone was, describing it as if an ice pick had been run into it. Mr. Mowry is unable to stand in one spot for very long. When he is standing, it does not take long for pain to begin in the bottom of his foot. Mr. Mowry describes it as if a nail had been driven right through the foot. He experiences relief once he sits down. However, his leg will begin to swell if it is down for too long, whether sitting or standing. This swelling causes his skin to crack and requires bandaging. As such, Mr. Mowry must elevate his leg to avoid further discomfort.

Dr. Bilfield testified that, with the current state of his leg, Mr. Mowry should be able to participate in sedentary activities such as watching TV, playing bridge, sewing, or crocheting. Mr. Mowry did not live a sedentary lifestyle prior to the accident. Since the accident, Mr. Mowry has not shot at all. He testified that he does not have much control over his left leg and does not feel it is safe to attempt to shoot. The Mowrys had to take a year off from going to the South Carolina gun club, but they intended to return in November of 2017. However, they were unable to do so and have not been able to return because of the accident and Mr. Mowry's resulting injuries.

Mr. Mowry is no longer able to hunt. He is not able to ride his motorcycle. He is not able to engage in any type of mechanic or maintenance work on vehicles. Aside from mowing the yard, which he can do while sitting, he is not able to help with any other yardwork or maintenance of

7

the home. Mr. Mowry's primary activity since the accident is sitting, whether it be in his chair, on his lawnmower, or in his vehicle.

Mr. Mowry was prescribed pain medicine after his procedures; however, because of health complications from taking the medicine after his surgeries in 2017, he has chosen to forgo prescription pain killers for his leg pain and instead takes over the counter pain reliever as needed. Mr. Mowry is not currently in physical therapy or any other type of treatment for the pain or for his leg injury in general.

Mrs. Mowry testified that prior to the accident, on a scale from one to ten, she and Mr. Mowry were at a nine or ten as to enjoyment of life. She testified that after the accident, that has declined to a two or three as she has turned into a caretaker and lost her "best friend and buddy" who would go out and do things with her. Before the accident, Mr. Mowry was enjoying his retirement and filling his everyday routine with hobbies he enjoyed. Included with this enjoyment was his companionship with his wife and actively participating in a joint activity that they both loved. As of July 16, 2017, those things ceased to be possible.

At trial, the Parties stipulated that Mr. Mowry's economic damages for medical expenses total $112,206.56 and are broken down as follows: $90,023.59 owed on a Medicare Lien, $16,361.67 owed to Altercare, Mr. Mowry's secondary insurance, and $5,821.30 for out-of-pocket expenses.

## II. CONCLUSIONS OF LAW

The Federal Tort Claims Act "allows a plaintiff to bring certain state-law tort suits against the Federal Government." *Brownback v. King*, 141 S.Ct. 740, 745 (2021).

8

A. Plaintiff David Mowry's Claim

Under Ohio law, to prevail on a negligence claim, Plaintiff must prove "(1) a duty requiring the defendant to conform to a certain standard of conduct, (2) breach of that duty, (3) a causal connection between the breach and injury, and (4) damages." *Cromer v. Children's Hosp. Med. Ctr. Of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, ¶ 23. As stipulated to by the Parties and previously found by the Court, Plaintiff has successfully established a duty and a breach.

1. Proximate cause

For an injury to be proximately caused by a negligent act, the injury "must be the natural and probable consequence of the negligence alleged and it ought to have been foreseen in the light of the attending circumstances". *Vadaj v. French*, 89 N.E.3D 73, 77, 2017-Ohio-1370 at ¶ 12 (8th Dist.) (internal citations omitted). "[T]he proximate cause of an event is that which in a natural and continuous sequence, unbroken by any new, independent cause, produces that event and without which that event would not have occurred". *Aiken v. Industrial Commission*, 143 Ohio St. 113, 117 (1944).

The Court finds that all injuries to Mr. Mowry's lower left leg were proximately caused by the negligent acts of the USPS driver in the July 16, 2017 accident. This includes the four surgeries in 2017 performed by Dr. Bickett, as well as all the surgeries Mr. Mowry underwent with a plastic surgeon. This also includes all the pain that Mr. Mowry has suffered and will continue to suffer in his lower left leg since the accident.

While Plaintiffs did not call a specific expert as to causation of Mr. Mowry's renal failure, it is clearly within the general expertise and knowledge of Mr. Mowry's attending surgeon, Dr. Bickett, to testify that the high dosage of antibiotics, specifically Vancomycin, that Mr. Mowry was given could have an adverse effect on his kidneys. Prior to the accident, Mr. Mowry did not

9

have any diagnoses that would suggest that his renal health was deteriorating, or renal failure was imminent. As the infection was proximately caused by the accident, the Court finds that Mr. Mowry's kidney deterioration and ultimate rental failure, which began less than two years after the accident and resulting procedures, infection, and use of the antibiotics, was also proximately caused by the accident.

2. Damages

Economic damages include "[a]ll expenditures for medical care or treatment, rehabilitation services, or other care, treatment, services, products, or accommodations as a result of an injury or loss to person or property that is a subject of a tort action" and "[a]ny other expenditures incurred as a result of an injury or loss to person or property that is a subject of a tort action, other than attorney's fees". R.C. 2315.18(A)(2). The Court finds that Plaintiff David Mowry's economic damages in this case for medical bills and expenses total $112,206.56, as stipulated by the Parties.

Noneconomic damages include, but are not limited to, "pain and suffering, loss of society, consortium, companionship, care, assistance, attention, advice, guidance, counsel, instruction, training, or education, disfigurement, mental anguish, and any other tangible loss" resulting from an injury that is the subject of a tort action. R.C. 2315.18(A)(4). R.C. 2315.18(B)(2) states that

> [e]xcept as otherwise provided in division (B)(3) of this section, the amount of compensatory damages that represents damages for noneconomic loss that is recoverable in a tort action under this section to recover damages for injury or loss to person or property shall not exceed the greater of two hundred fifty thousand dollars or an amount that is equal to three times the economic loss, as determined by the trier of fact, of the plaintiff in that tort action to a maximum of three hundred fifty thousand dollars for each plaintiff in that tort action or a maximum of five hundred thousand dollars for each occurrence that is the basis of that tort action.

R.C. 2315.18(B)(3) states that

> [t]here shall not be any limitation on the amount of compensatory damages that represents damages for noneconomic loss that is recoverable in a tort action to

10

> recover damages for injury or loss to person or property if the noneconomic loss of the plaintiff are for either of the following:
>
> (a) Permanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system;
>
> (b) Permanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life-sustaining activities.

The Court finds that Mr. Mowry has a permanent and substantial physical deformity. Both doctors' testimony in this case agree that Mr. Mowry has a deformity and that it is permanent. The Court finds that it is also a substantial deformity. The skin on his lower left leg is permanently deformed with scarring from the multiple surgeries, primarily from the skin graft and transfer of muscle from his calf which created a large scar on the front of his lower leg. The musculature within Mr. Mowry's leg was permanently altered and it will never be the same as it was prior to the accident or equivalent to that of his right leg. Mr. Mowry is in constant and consistent pain because of this injury. Therefore, Mr. Mowry has a permanent and substantial physical deformity of his left lower leg. The damages cap set forth in R.C. 2315.18(B)(2) does not apply.

Mr. Mowry had to undergo four separate surgeries within six months to repair his tibia and fibula and the subsequent infection. These are in addition to the plastic surgery he had during the same timeframe. Each of these surgeries required Mr. Mowry to go under general anesthesia. Since July 16, 2017, Mr. Mowry has been in constant pain. He has chosen to forgo prescribed pain medicine due to health reasons. After his renal failure diagnosis, Mr. Mowry's overall health declined and, as of March 2022, Mr. Mowry has been confined for 12 hours a day to receive dialysis. As of July 16, 2017, Mr. Mowry was a 69-year-old active, hardworking individual who was enjoying his retirement and pursuing his hobbies. Since the accident, he has been resigned to sedentary activities and sitting for most of the day. A large source of enjoyment in his relationship with his wife was also lost after the accident as they would share in these hobbies together.

11

Mr. Mowry is accordingly awarded $112,206.56 in economic damages and $1,000,000 in noneconomic damages for pain and suffering proximately caused by the July 16, 2017 accident.

B.  Plaintiff Beverly Mowry's Loss of Consortium Claim

"When one spouse is injured, the other spouse is also damaged and may assert his or her own cause of action against the tortfeasor for those damages – *i.e.*, a claim for loss of consortium." *Schaefer v. Allstate Ins. Co.*, 76 Ohio St.3d 553, 557 (1996) (emphasis in original). The spouse may seek damages for "the direct hurt which she has suffered by reason of the loss of her husband's society, services, sexual relations and conjugal affection which includes companionship, comfort, love and solace". *Bowen v. Kil-Kare, Inc.*, 63 Ohio St.3d 84, 91-92 ((1992). While it is derivative, the loss of consortium claim is "legally separate and independent from the claim of the spouse who suffered the bodily injury". *Schaefer*, 76 Ohio St.3d at 557.

After the July 16, 2017 accident, Mrs. Mowry went from being a companion to a caregiver. Before the accident, she was actively enjoying her retirement alongside her husband. Their joint passion of trapshooting was a part of their everyday life as a couple. After the accident, that enjoyment ceased and was not able to be revived. While Mr. Mowry is still physically in the home with Mrs. Mowry and they still spend time together, a large aspect of their companionship was abruptly taken from her. Before the accident, Mr. Mowry would share in the responsibilities to maintain their home and property. Now, aside from mowing the yard, those physical responsibilities fall squarely on Mrs. Mowry due to Mr. Mowry's physical limitations. For the last four and a half years, Mrs. Mowry has had to play a different role in their relationship and home and will have to continue to do so.

Mrs. Mowry has lost a significant amount of companionship and enjoyment with her husband because of the accident and resulting permanent injury. She has also lost his services in

maintaining their home of 44 years. Mrs. Mowry is accordingly awarded $250,000 in damages for her loss of consortium claim.

### III. CONCLUSION

As stated above, Mr. Mowry is awarded $112,206.56 in economic damages and $1,000,000 in noneconomic damages. Mrs. Mowry is awarded $250,000 for her loss of consortium claim. In closing, the Court notes that awarding pain and suffering damages has often been referred to as the sad bookkeeping of tragedy. A state court judge eloquently stated that

> recovery for noneconomic losses such as pain and suffering and loss of enjoyment of life rests on the legal fiction that money damages can compensate for a victim's injury. We accept this fiction, knowing that although money will neither ease the pain nor restore the victim's abilities, this device is as close as the law can come in its effort to right the wrong. We have no hope of evaluating what has been lost, but a monetary award may provide a measure of solace for the condition created.

*In re Joint E. & S. Dist. Asbestos Litig.*, 9 F. Supp. 2d 307, 311-312 (S.D.N.Y. 1998). Having listened to all that Mr. and Mrs. Mowry have lost as a result of the accident, the Court has awarded the sums detailed herein in the hope of providing a measure of solace. The Court was not swayed by sympathy or any bias or prejudice but has awarded the sums discussed previously as just compensation for all that has been lost.

Pursuant to Fed. R. Civ. P. 54(b), the Court hereby finds that there is no just reason for delay.

IT IS SO ORDERED.

Date: April 25, 2023

*/s/ John R. Adams*
JOHN R. ADAMS
UNITED STATES DISTRICT JUDGE